**Interlocutory Orders in No. 14-13-00043-CV Reversed in Part and Affirmed in Part; Interlocutory Order in No. 14-13-00073-CV Affirmed; and Opinion filed January 28, 2014.**



**In The**

# Fourteenth Court of Appeals
_____

**NO. 14-13-00043-CV**
_____

**PAREX RESOURCES, INC. AND RAMSHORN INTERNATIONAL LIMITED, Appellants**

**V.**

**ERG RESOURCES, LLC, Appellee**

_____

**NO. 14-13-00073-CV**
_____

**ERG RESOURCES, LLC, Appellant**

**V.**

**PAREX RESOURCES (BERMUDA), LTD., Appellee**

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-16446**

## O P I N I O N

In trial court cause number 2012-16446, ERG Resources, LLC ("ERG") sued Parex Resources, Inc. ("Parex Canada"), Ramshorn International Limited ("Ramshorn"), and Parex Resources (Bermuda), Ltd. ("Parex Bermuda") (collectively, "the Defendants"). In this opinion, we consider two companion interlocutory appeals stemming from the trial court's disposition of Parex Canada's, Ramshorn's, and Parex Bermuda's respective special appearances. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2013) (authorizing appeal from interlocutory order that "grants or denies the special appearance of a defendant under Rule 120a, Texas Rules of Civil Procedure[.]"). In cause number 14-13-00043-CV, we (1) reverse the trial court's order denying Parex Canada's special appearance and render judgment dismissing for want of jurisdiction ERG's claims against Parex Canada, and (2) affirm the trial court's order denying Ramshorn's special appearance and remand for further proceedings. In cause number 14-13-00073-CV, we affirm the trial court's order granting Parex Bermuda's special appearance, dismissing for want of jurisdiction ERG's claims against Parex Bermuda.

## I. BACKGROUND

Parex Canada is a public Canadian company engaged in oil and gas production in South America and the Caribbean. Ken Pinsky is Parex Canada's CFO. Parex Canada has several subsidiaries, including Parex Bermuda and Parex Resources (Colombia) Ltd. ("Parex Colombia").

Ramshorn is an oil and gas company formed under Bermudian law with (1) Class A shares relating to Colombian exploration assets, and (2) Class B shares relating to an oil and gas contract in Peru. This case involves the Class A shares. Claudia Arango was the general manager of Ramshorn in Colombia.

Nabors Global Holdings II, Limited ("Nabors Global") is a Bermudian company that owned 100% of Ramshorn's Class A shares. Nabors Global's parent, Nabors Industries Ltd. ("Nabors Industries"), wanted to sell all of its interests related to the exploration industry, which included Nabors Global's ownership of the Class A shares. During the fall of 2011, the CEO of Nabors Industries, Tony Petrello, publicly announced Nabors Industries's desire to exit the exploration industry. Jordan "Digger" Smith was head of global exploration for the Nabors entities. Smith was heavily involved in selling the Class A shares. Additionally, Scott Peterson, an employee of Nabors Corporate Services, Inc. ("Nabors Corporate") and an attorney for one or more of the Nabors entities, was involved in selling the Class A shares.

In December 2011, Charles Dunne, COO of ERG, a Houston company, discussed the Class A shares with Smith. Dunne and Smith were friends and had previously worked together on transactions. Later that month, Arango emailed a draft presentation to Smith, who in turn forwarded the presentation to Dunne. The presentation contained, among other information, statements regarding Ramshorn's ownership of an exploration block called "the Jag-A block." ERG alleges this information was fraudulent.

In January 2012,[1] Dunne and other ERG personnel traveled with Smith to Colombia for a due-diligence presentation about Ramshorn. During the presentation, Ramshorn allegedly represented it held a 95% working interest in the Jag-A block, but admitted its interest was not yet recognized by the Colombian government (apparently a requirement in Colombia). However, Ramshorn allegedly represented that it had an agreement with Columbus Energy, Ltd.

---

[1] Unless specified otherwise, the remaining dates discussed in the background section pertain to 2012.

("Columbus"), an entity which did hold a government-recognized 95% interest in the Jag-A block, and that it controlled Columbus. ERG alleges all these representations were false.

Later in January, ERG personnel, including Dunne, met with Smith and Peterson in Houston. During the meeting, Peterson purportedly stated that Ramshorn had "clean title" to its Colombian interests and Nabors Global controlled Columbus. Over the next few months, ERG continued to conduct due-diligence review of the Class A shares. In mid-March, Nabors[2] provided ERG access to Ramshorn's virtual data room, whereby ERG could remotely view updated information regarding Ramshorn. The actual server housing the information was located in Texas.

In February or March, Smith contacted Royal Bank of Canada to inquire about other potential bidders for the Class A shares. Royal Bank of Canada acted as a facilitator when Nabors previously offered to sell Ramshorn's Class A shares and certain Colombian assets we will refer to as "the Remora assets."[3] Parex Colombia had ultimately acquired the Remora assets, and Parex Canada had been involved in this acquisition. After Smith contacted Royal Bank of Canada in February or March, Bevin Wirzba, a person affiliated with Royal Bank of Canada, contacted Parex Canada concerning the Class A shares. Wirzba thought Parex[4] might be interested because of Parex Colombia's purchase of the Remora assets.

---

[2] Unless specified otherwise, we will use the term "Nabors" to refer to one or more of the Nabors entities, including Nabors Global.

[3] There is evidence supporting a finding that Nabors owned the Remora assets when they were sold to Parex Canada.

[4] Unless specified otherwise, we will use the term "Parex" to refer to one or more of the Parex entities, including Parex Canada, and Royal Bank of Canada and Wirzba in their capacity as agents of the Parex entities.

Parex was interested and shortly thereafter retained Wirzba and Royal Bank of Canada as advisors regarding acquisition of the Class A shares.

Over the next few days, Parex exchanged several communications pertaining to the Class A shares with Nabors, including non-binding letters of intent ("LOIs") and proposed share-purchase agreements ("SPAs"). By March 7, Parex Colombia had offered to purchase the Class A shares for $50 million. Parex Canada asserts that it had no interest in purchasing the shares but was merely assisting its subsidiary Parex Colombia to make the purchase. Nabors also provided Parex access to Ramshorn's virtual data room.

On March 9, Nabors Global entered into an SPA with ERG ("the ERG SPA"), in which ERG agreed to purchase the Class A shares for $45 million, closing at 9:00 a.m. on March 15. Ramshorn was not a party to the ERG SPA. ERG allegedly made a $3 million escrow deposit toward the purchase price. Ramshorn continued to give due-diligence information to ERG, including allowing ERG access to Ramshorn's virtual data room.

As described in more detail below, on March 9, Nabors informed Parex that Nabors had selected another purchaser. Parex Colombia increased its offer to $55 million, but Nabors did not accept.

ERG and Nabors Global failed to close by March 15. The following day, Parex Canada personnel asked Nabors for a status update. Nabors responded that the closing date had passed but they were negotiating a new closing date. Parex Colombia then increased its offer to $75 million. However, despite the increased offer, Nabors entered into an agreement with ERG to extend the closing deadline until March 19. Nabors informed Parex Canada of this extension and that Nabors would advise Parex Canada if the deal with the counterparty failed to close.

5

On March 17 and 18, while continuing to conduct due diligence, ERG allegedly learned Ramshorn did not have a valid interest in the Jag-A block, Nabors Global did not control Columbus, and Ramshorn had misrepresented certain financial information. ERG raised these issues with Peterson. According to Dunne, Peterson replied that ERG should take the Class A shares "as is" and waive the other problems. Dunne avers that when ERG tendered performance, Nabors refused to close but directed the escrow agent to release the $3 million deposit to Nabors. On March 19, Peterson sent an email to ERG, indicating that by missing the closing date, ERG ended the negotiations and Nabors Global was terminating the ERG SPA.

On March 19 and 20, Parex Canada emailed Nabors, asking whether they had closed the deal with the counterparty. On March 20, ERG filed suit against Nabors Global, Ramshorn, and Parex Canada, requesting specific performance of the ERG SPA and injunctive relief and asserting tortious-interference claims against Parex Canada and Nabors Global. An ancillary court denied ERG's request for a temporary restraining order enjoining sale of Ramshorn's Class A shares and set a hearing on ERG's request for a temporary injunction for April 13.

On March 21, Parex re-submitted the $75 million proposal to Nabors. On March 23, ERG obtained an ex parte injunction from a Bermuda court, temporarily restricting Nabors from selling the Class A shares. On April 5, the Bermuda court discharged the injunction after a full hearing with all parties.

On April 9, Parex Bermuda was incorporated in Bermuda. On April 12, Nabors and Parex Bermuda executed an SPA ("the Parex SPA") for the Class A shares, containing a New York forum-selection clause. Parex Bermuda executed the Parex SPA in Bermuda. Also on April 12, Parex Canada signed a guarantee in favor of Nabors, guaranteeing payment owed by Parex Bermuda under the Parex

6

SPA. This guarantee also had a New York forum-selection clause. A provision in the Guarantee expressed it was executed to induce Nabors to enter into the Parex SPA.

ERG amended its petition to add a tortious-interference claim against Parex Bermuda and a fraud claim against Ramshorn. Parex Canada, Parex Bermuda, and Ramshorn filed special appearances. After the parties conducted jurisdictional discovery and submitted several rounds of special appearance pleadings, the trial court held an evidentiary hearing on November 19 and 20. On January 3, 2013, the trial court denied Parex Canada's and Ramshorn's special appearances, but granted Parex Bermuda's special appearance. The trial court did not make findings of fact.

## II. SPECIAL APPEARANCE: STANDARD OF REVIEW AND RELEVANT LAW

### A. Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). The trial court's decision to grant or deny a special appearance is subject to de novo review on appeal. *Id.* at 806. However, the trial court's factual findings supporting its ruling on the special appearance may be challenged for legal and factual sufficiency. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Because the trial court did not issue findings of fact, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's ruling. *Id.*

When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822

7

(Tex. 2005). We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to find the fact under review. *Id.* The fact finder is the sole judge of witness credibility and the weight to give their testimony. *See id.* at 819.

In a factual-sufficiency review, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* at 407. We may not substitute our own judgment for that of the trier of fact or pass upon the credibility of the witnesses. *Id.* The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Yeng v. Zou*, 407 S.W.3d 485, 489 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

## B. Special Appearance Law

Texas courts may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). Under the Texas long-arm statute, the plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). When the plaintiff meets this initial burden, the burden shifts to the defendant to negate all potential bases for personal jurisdiction pleaded by the plaintiff. *Id.* The Texas long-arm statute extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit. *Marchand*, 83 S.W.3d at 795. Thus, we rely on precedent from the United States Supreme Court and other federal courts,

as well as our own State's decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction. *Id.*

Personal jurisdiction over a nonresident defendant is constitutional when two conditions are satisfied: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Moki Mac*, 221 S.W.3d at 575. There are three aspects pertinent to a purposeful-availment inquiry: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied on must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage or profit by "availing" itself of the jurisdiction. *Id.* This three-part inquiry assesses the quality and nature of the contacts, not the quantity. *Retamco*, 278 S.W.3d at 339. A defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there. *Moki Mac*, 221 S.W.3d at 575. At its core, the purposeful-availment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 152 (Tex. 2013).

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *Marchand*, 83 S.W.3d at 795–96. When specific jurisdiction is alleged, we focus the minimum-

9

contacts analysis on the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76. Specific jurisdiction is established if the defendant's alleged liability arises out of or is related to an activity conducted within the forum. *Id.* at 576; *Marchand*, 83 S.W.3d at 796. For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585.

Conversely, if the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts. *Id.* at 575; *Marchand*, 83 S.W.3d at 796. A general-jurisdiction inquiry is very different from a specific-jurisdiction inquiry and involves a more demanding minimum-contacts analysis with a substantially higher threshold. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007). Usually, the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services, or maintaining one or more offices there. *Id.* Activities less extensive than that will not qualify for general jurisdiction. *Id.* Courts analyze general jurisdiction without regard to the nature of the alleged claims. *See id.* In conducting a general-jurisdiction analysis, we are concerned with the quality rather than the quantity of the contacts, and the defendant's pre-suit contacts are the only relevant contacts. *See id.* at 169; *Coleman*, 83 S.W.3d at 809–10. In assessing the quality of the contacts, we do not view each contact in isolation; rather, we carefully investigate, compile, sort, and analyze all contacts to determine if together they are sufficient to support general jurisdiction. *Coleman*, 83 S.W.3d at 809.

## III. EVIDENTIARY ISSUES

### A. What exhibits did the trial court consider?

We begin with a major source of contention in this appeal: which of ERG's exhibits did the trial court consider? *See Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878, 884 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[W]e consider all of the evidence *before* the trial court on the question of [personal] jurisdiction." (emphasis added)). In the second issues of their respective appeals, Parex Canada and Ramshorn contend we must assume the trial court did not consider any exhibits unless they were specifically admitted during the special appearance hearing. Contrarily, ERG argues we must assume the trial court considered all of ERG's exhibits except the few exhibits to which the court expressly sustained objections.

Prior to the November 19 and 20, 2012 special appearance hearing, ERG filed with the court clerk deposition excerpts, affidavits, and an exhibit list referencing almost 400 exhibits, but did not file the actual exhibits or affidavits authenticating the exhibits. The Defendants filed written objections to most of the exhibits. During the two-day hearing, the parties and the trial court spent substantial time discussing the Defendants' objections to ERG's exhibits. The trial court admitted over ninety of ERG's exhibits and sustained objections to approximately four exhibits. ERG offered into evidence the remaining 300-plus exhibits. The trial court did not formally admit the exhibits. Instead, several times during the hearing, the trial court clearly expressed it was not admitting the remaining exhibits but would consider objections (specifically, the Defendants' relevancy objections) to these exhibits later in chambers and set a future hearing if necessary to resolve any objections. The trial court also expressed that it would inform the parties what exhibits were admitted. The Defendants noted, with

11

apparent agreement from ERG, that ERG's exhibits had not been filed with the court. At the end of the hearing, the following exchange occurred:

> [ERG Counsel:] And, your Honor, here I have all of our exhibits on two CDs. Should I give those to the court reporter?
>
> [Trial Court:] No. Those are mine. Those aren't filed as part of this hearing. These are the exhibits so that when I'm going through looking at my list I can pull the exhibit up and resolve the objection.
>
> [The Defendants' Counsel:] The two CDs will become part of the court's record?
>
> [Trial Court:] Yes. I can make them if you need that to be. That's no problem.
>
> [The Defendants' Counsel:] I'm just wondering what if it goes up.
>
> [Trial Court:] Yeah. We'll file them, figure out how the clerk does that. I will make these part of the court's record.
>
> [The Defendants' Counsel:] If you need paper we can, obviously, work that out.

The reporter's record contains a volume of exhibits that, as certified by the court reporter, were "*admitted* into evidence during the Hearing on Special Appearance." (emphasis added).[5] There are also supplemental reporter's records containing all of ERG's exhibits that, as certified by the court reporter, were "*offered* into evidence during the Hearing on Special Appearance." (emphasis added).

On December 10, 2012, ERG filed an amended exhibit list, detailing what exhibits ERG believed had been admitted and which remained subject to pending evidentiary objections. On December 26, 2012, the court reporter filed a CD containing ERG's exhibits and the Defendant's objections to the exhibits, noting,

---

[5] According to the Defendants, this reporter's record volume erroneously contains several exhibits not admitted during the hearing. However, we need not delve into this alleged error because these exhibits are not material to our analysis.

12

"I, . . . Official Court Reporter file with [the district clerk's office] the following exhibits which were admitted or tendered on bill of exception during a hearing, proceeding, or trial . . . on 11/19/12 Special App[.]"

On January 3, 2013, the trial court ruled on the Defendants' special appearances without making any further evidentiary rulings. On January 14, 2013, ERG filed a proposed order overruling the Defendants' objections to ERG's exhibits. Included with the proposed order was a letter from ERG's counsel requesting the trial court to rule on the objections to ERG's exhibits not admitted during the hearing. However, nothing reflects that ERG set this request for a hearing or submission or that the trial court ever entertained this request.[6]

Texas Rule of Civil Procedure 120a governs the evidentiary aspect of special appearance filings and proceedings:

> The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony. The affidavits, if any, shall be served at least seven days before the hearing, shall be made on personal knowledge, shall set forth specific facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify.

Tex. R. Civ. P. 120a(3).

ERG argues we must assume all of its exhibits were considered by the trial court because Rule 120a provides that special appearances are decided by "affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony," and the record reflects ERG's exhibits were

---

[6] The Defendants assert that, during a February 8, 2013 status conference, the trial court stated it did not consider many of ERG's exhibits. We may not consider this assertion because we do not have a reporter's record of the purported status conference.

filed with the court.[7] ERG notes that at the end of the hearing, the trial court agreed to file all of the exhibits, and the court reporter's December 26 filing indicates that all of the exhibits were filed. In support of its position, ERG cites Rule of Civil Procedure 74:

> The filing of pleadings, other papers and exhibits as required by these rules shall be made by filing them with the clerk of the court, except that the judge may permit the papers to be filed with him, in which event he shall note thereon the filing date and time and forthwith transmit them to the office of the clerk.

Tex. R. Civ. P. 74.[8]

Although Rule 120a envisions parties filing affidavits before the special appearance hearing,[9] it is clear from the record that the parties treated ERG's exhibits as evidence offered during the hearing and not already on file. ERG offered its exhibits, the parties argued about evidentiary objections, and the trial court ruled on some objections and reserved its ruling on other objections. ERG did not object to this procedure or assert that its exhibits had already been admitted into evidence pursuant to Rule 120a. At the end of the hearing, the trial court expressed that the exhibits would be filed but in no way altered its decision to rule on the admissibility of the exhibits in chambers after the hearing. The court

---

[7] In a post-hearing filing, ERG asserted that its exhibits were properly in evidence because they were the "results of discovery processes." Tex. R. Civ. P. 120a(3). It would be unreasonable to interpret this rule to mean we presume the trial court considered any evidence produced during discovery even if the trial court expressly postponed its ruling on the admissibility of the evidence and nothing shows the court ever actually admitted the evidence.

[8] ERG also directs us to a pre-hearing Rule 11 agreement in which the parties agreed on certain deadlines relevant to special appearance pleadings and evidence. This agreement does not establish that the exhibits were filed before the hearing or otherwise considered by the trial court.

[9] *See L. Ray Calhoun & Co. v. Railroad Salvage & Restoration, Inc.*, No. 03-08-00198-CV, 2009 WL 280760, at *2 (Tex. App.—Austin Feb. 5, 2009, no pet.) (mem. op.) (holding Rule 120a did not require party to offer into evidence affidavits filed over one month before special appearance hearing).

14

reporter's December 26 filing does not demonstrate that the exhibits were admitted but merely establishes the exhibits were filed and either admitted *or* made part of a bill of exceptions.

Accordingly, aside from the exhibits admitted during the hearing, there is nothing in the record indicating whether the trial court admitted the remaining exhibits when the court reviewed them in chambers.[10] Because it was ERG's burden as the proponent of the almost 400 exhibits to secure a ruling on their admissibility, we will not consider any exhibits not expressly admitted by the trial court. *See Le Meridien Hotels & Resorts v. LaSalle Hotel Operating P'ship, I, L.P.*, 141 S.W.3d 870, 876 (Tex. App.—Dallas 2004, no pet.) (refusing to consider evidence offered during special appearance hearing but not expressly admitted), *overruled on different ground by Capital Tech. Info. Servs., Inc. v. Arias & Arias Consultores*, 270 S.W.3d 741, 755 (Tex. App.—Dallas 2008, pet. denied) (en banc); *cf. Dallas Market Center v. The Swing, Inc.*, 775 S.W.2d 838, 842 (Tex. App.—Dallas 1989, no writ) ("At the very most, the exhibits that were tendered to this Court, absent a showing that they were properly offered into evidence and that the trial court admitted them into evidence during trial, are loose exhibits, forming no part of the record proper."). Accordingly, we sustain the portions of Parex Canada's and Ramshorn's second issues concerning which exhibits the trial court considered.

---

[10] ERG relies on an opinion in which our sister court considered all of the non-movant's special appearance evidence because the trial court never ruled on the movants' evidentiary objections. *Monterosso v. Vance*, No. 01-07-00972-CV, 2008 WL 4006763, at *7 n.6 (Tex. App.—Houston [1st Dist.] Aug. 28, 2008, no pet.) (mem. op.). However, *Monterosso* does not provide guidance here because nothing in the opinion indicates the non-movant's evidence was filed before the hearing or actually admitted.

15

## B. Parex Canada's and Ramshorn's evidentiary issues

Parex Canada and Ramshorn also argue in their respective second issues that the trial court made several erroneous evidentiary rulings. First, Parex Canada and Ramshorn contend the trial court erred by overruling their evidentiary objections to the deposition testimony presented by ERG. We review for an abuse of discretion a trial court's ruling on the admission of special appearance evidence. *See Nichols v. Tseng Hsiang Lin*, 282 S.W.3d 743, 747 (Tex. App.—Dallas 2009, no pet.).

The Defendants made almost 260 objections to various portions of eight witnesses' deposition testimony. However, Parex Canada and Ramshorn do not argue on appeal why any specific objections were meritorious or pertained to testimony material to our analysis. Instead, they merely direct us to the clerk's record for their objections and the trial court's rulings. We will not review the propriety of the trial court's rulings on hundreds of objections without more guidance from the Defendants, particularly because most of the objections are based on relevancy which requires consideration of the objectionable evidence in light of the underlying purpose of the special appearance. *See Nguyen v. Kosnoski*, 93 S.W.3d 186, 188 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("This Court has no duty to search a voluminous record without guidance . . . to determine whether an assertion of reversible error is valid.").

Parex Canada and Ramshorn also broadly contend the trial court erred by overruling their objections to Dunne's and Nicolas Gomez de la Torre's affidavits. First, we do not consider the propriety of the trial court's rulings regarding de la Torre's affidavit because this affidavit is not material to our analysis. Second, we overrule Parex Canada's and Ramshorn's complaints about portions of Dunne's affidavit which the trial court admitted over the Defendant's objections because we

16

do not rely on them in our analysis, similar information came in through other evidence or ERG's petition, or the testimony is relevant and not hearsay.[11]

Additionally, Parex Canada and Ramshorn contend the trial court erred by sustaining ERG's objection to Arango's affidavit statement, "In the course of preparing for my deposition and giving this affidavit, I learned that [Smith] was never the President of Ramshorn." We need not rule on this contention because, as expressed below, we affirm the trial court's denial of Ramshorn's special appearance even considering this statement to have been admitted into evidence. Accordingly, we overrule, or need not rule on, those portions of Parex Canada's and Ramshorn's second issues concerning the trial court's evidentiary rulings.

## IV. PAREX CANADA'S SPECIAL APPEARANCE

Having determined the body of evidence considered by the trial court, we turn to Parex Canada's appeal. In its first issue, Parex Canada contends the trial court erred by denying Parex Canada's special appearance. We begin by considering the trial court's implicit ruling that it may exercise specific jurisdiction over Parex Canada.

### A. The trial court lacks specific jurisdiction over Parex Canada

Parex Canada's primary challenge regarding specific jurisdiction is that Parex Canada lacks sufficient purposeful contacts with Texas to give rise to personal jurisdiction. We first consider whether Parex Canada's Texas contacts were purposeful rather than the result of unilateral activity of another party or a third person. *Moki Mac*, 221 S.W.3d at 575.

---

[11] Relative to Parex Canada's and Ramshorn's hearsay and relevancy objections to an important portion of Dunne's affidavit, see footnote 41.

17

Smith, who worked for Nabors and was instrumental in negotiating the sale of the Class A shares, testified that once ERG declined to continue pursuing a deal for the Class A shares, he "contacted Royal Bank of Canada and asked them if they wanted to go back to various of the companies that [they] had talked to in 2010 and see if they knew if they were interested in buying the shares."[12] Smith explained that he contacted Royal Bank of Canada "around very early March. March 1st, towards the end of the first week or beginning of the second week of March." Wirzba, who was associated with Royal Bank of Canada and hired by Parex to advise regarding the Class A shares, emailed an LOI to Smith on March 1, 2012. Additionally, in a February 17, 2012 email, Smith informed Nabors CEO Petrello that Smith had "talked to and commenced teeing up [Royal Bank of Canada]" with the belief that Royal Bank of Canada would find a better offer for the Class A shares than the offer made by ERG.

Thus, although the record is not clear on exactly when Smith first contacted Royal Bank of Canada about the Class A shares, it is undisputed that Smith initiated contact with Royal Bank of Canada, who in turn contacted Parex Canada. This means Parex Canada's initial contact with Nabors regarding purchase of the shares was solicited by Nabors and did not stem from Parex Canada's unsolicited decision to reach into Texas.[13] Accordingly, Parex Canada's decision to engage in negotiations with a Texas company for the purchase of shares of a Colombian entity was fortuitous and based on Nabors's unilateral activities. *See Peters v. Top Gun Exec. Grp.*, 396 S.W.3d 57, 69 (Tex. App.—Houston [14th Dist.] 2013, no

---

[12] As noted above, Royal Bank of Canada facilitated sale of the Remora assets to Parex in 2010.

[13] We note there is evidence Parex Canada had dealings with Nabors in 2010 pertaining to the Remora assets. Thus, when Parex Canada contacted Nabors regarding the Class A shares, Parex Canada presumably already knew some of Nabors's personnel operated from Houston.

18

pet.) ("[I]ssues of 'who initiated contact' and the frequency of solicitations are particularly important for determining whether the defendant purposefully availed itself of the forum in a buy-sell case.").

Nevertheless, ERG contends that, regardless of whether Nabors initially solicited Parex Canada,

> [a]ny "solicited" bidding ended on March 9, 2012 when the ERG SPA was executed and Nabors unambiguously informed [Parex Canada] that [Nabors] had "a deal with another purchaser." From then on, [Parex Canada's] barrage of communications to Nabors in Texas [was] uninvited and unsolicited, and Nabors repeatedly told [Parex Canada] that should circumstances change, [Nabors] would contact [Parex Canada], not the other way around.

(citations omitted). ERG argues that, after learning Nabors had entered into a contract with another party, Parex Canada continued to send inquiries and increased offers to Texas-based Nabors. Moreover, according to ERG, Parex Canada knew Nabors's other purchaser was Texas-based ERG.

We agree the evidence supports a finding that Parex Canada knew Nabors[14] was based in Texas and continued to make email and telephone contacts with Nabors after being informed Nabors had entered into an SPA for the Class A shares.[15] Additionally, although Parex Canada presented testimonial evidence

_____

[14] Parex Canada asserts Nabors Global is a Bermudian entity which employed Nabors Corporate personnel working in Houston to negotiate sale of the Class A shares with Parex Canada. According to Parex Canada, this fact further attenuates the Texas connection because Parex Canada had no control over Nabors Global choosing Texas-based Nabors Corporate to facilitate the sale. We do not agree that this is a significant point of attenuation because emails sent by persons working for the Nabors entities to Parex Canada contained Texas addresses, and Parex Canada's LOIs included references to the Nabors entities at a Houston address. Hence, regardless of the Nabors entity involved, Parex Canada knew it was negotiating with Nabors-related individuals located in Texas.

[15] Parex Canada attempts to discount its role in negotiations for the Class A shares by arguing it was Parex Colombia, and later Parex Bermuda, which were the actual Parex entities interested in buying the shares. However, as ERG responds, tortious interference does not

19

indicating that Parex Canada did not learn the counterparty was ERG until March 20, 2012, ERG presented deposition testimony of Smith, who agreed with the statement, "On March 9, 2012, [Parex Canada] was notified by Nabors that ERG and Nabors had entered into a share purchase agreement[.]" Thus, we must defer to the trial court's implicit finding that Parex Canada knew on March 9, 2012 that ERG was the counterparty. The trial court also could have reasonably inferred from the evidence that Parex Canada knew ERG was based in Texas.

Accordingly, after Nabors told Parex Canada that Nabors would contact Parex Canada if the ERG SPA did not close, Parex Canada became the solicitor by continuing to contact Nabors. At this point, Parex Canada contacted Texas-based Nabors knowing that Nabors's counter-party was Texas-based ERG. Thus, Parex Canada's Texas contacts as of March 9, 2012 were not based solely on Nabors's unilateral activity or in response to Nabors's inquiries. Nevertheless, Parex Canada's decision to reach into Texas via these contacts was certainly less purposeful than if Parex Canada was independently seeking out a Texas seller without initial prompting from Nabors. Parex Canada was still negotiating to buy Colombian assets from a seller who happened to live in Texas and who had originally reached out to Parex Canada. Moreover, the fact that Texas-based ERG was now part of the equation was based on Nabors's unilateral decision to contract with ERG, not any Parex Canada decision. Hence, although Parex Canada became the solicitor following execution of the ERG SPA, this fact does not support substantial Texas availment.

---

depend on which entity ultimately benefited the most from the induced breach. Parex Canada may be held responsible for tortiously interfering with the ERG SPA regardless of which entity purchased the shares. Thus, Parex Canada's distinction does not affect our jurisdictional analysis. Furthermore, the fact that Parex Canada's name, officers, and agents were involved in many of the communications sent to Nabors supports a finding that Parex Canada was a party that made the contacts with Nabors.

20

Moreover, the mere fact that Parex Canada and Nabors exchanged numerous communications, as opposed to the single communication considered in the seminal specific-jurisdiction case, *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777 (Tex. 2005), does not weigh in favor of purposeful availment because sale of multimillion-dollar South American oil and gas assets naturally is going to involve more negotiation and consideration than sale of a recreational vehicle. *See Bryan v. Gordon*, 384 S.W.3d 908, 916–17 (Tex. App.— Houston [14th Dist.] 2012, no pet.) ("We acknowledge that there was a singular phone call in *Michiana* whereas Gordon and Bryan engaged in multiple phone conversations. However, a real estate agent's representation of a client in a sale of property might naturally encompass more phone communications than involved in sale of a product[.]"); *see also Retamco*, 278 S.W.3d at 339 ("[T]he minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number."). We now consider the quality and nature of Parex Canada's specific contacts with Texas after execution of the ERG SPA.

The record reflects that from March 9, 2012 until April 12, 2012, the following events occurred:

- Sometime on March 9, although it is unclear when, Smith notified Parex that Nabors had entered into an agreement with ERG for purchase of the Class A shares. Additionally, at around 3:52 p.m., Peterson emailed Parex, informing them, "Looks like we have a deal with another purchaser. Hope to close next week. If there's a hiccup in closing with them, you'll be the first to know. Thanks." Around ten minutes later, Wirzba emailed Nabors, stating, "I understand you have chosen to move on with another party. Our client would like you to reconsider our proposal at a level of $55 million." At some point Wirzba left a voice mail with Peterson regarding this email.

- On March 12, in response to the $55 million offer, Peterson emailed Wirzba, stating that Nabors is going with the counterparty and will inform Wirzba of any changes. Wirzba replied, "I presume the extra $5mm didn't convince you to terminate discussions." Peterson replied that the $5 million increase

21

was attractive but that Nabors had already signed an agreement with the counterparty. Wirzba emailed Smith and Peterson, requesting Ramshorn re-prepare certain seismic data, noting, "Parex would be happy to pick them up in country"—meaning in Colombia.

- ERG and Nabors failed to close by March 15.

- On March 16, Wirzba contacted Peterson and asked for a status update regarding the Nabors-ERG transaction. Peterson informed him the original closing date had passed but that the parties were negotiating a possible extension of the closing date; Peterson did not state that the ERG SPA had terminated. Wirzba told Peterson that Parex was going to increase its offer. Wirzba also emailed Nabors, stating, "[W]e understand that your counterparty . . . has not yet closed . . . [and] you had originally given them until the 15th of March to close . . . . Our client (Parex Resources) will be sending you, within the hour, a signed LOI for the interests with an increased revised offer of $75MM[.]" Minutes later, Parex Canada CFO Pinsky emailed Nabors a LOI from Parex Colombia with a $75 million offer. Additionally, Pinsky emailed Nabors advising, "We understand a client relationship may be part of your decision on the sale of your Ramshorn interest. [O]ur COO advises he is ready and able to serve notice for termination on a current contract and enter into good faith negotiations with Nabors Colombia." According to ERG, Pinsky was offering to hire a Nabors entity as Parex Canada's drilling contractor in Colombia in order to further entice Nabors regarding sale of the Class A shares.

- Also on March 16, Nabors entered into an agreement with ERG to extend the closing deadline until Monday, March 19. Wirzba called Nabors, who informed Wirzba of the ERG SPA extension. Laura Doerre, general counsel for a Nabors entity, emailed Wirzba, informing him that Nabors's agreement with ERG was not terminated and they planned to close "Monday morning" but would let Wirzba know if the deal did not close. Doerre included with the email a draft SPA with a Texas forum-selection clause.

- On March 19, Peterson sent an email to ERG, indicating (1) ERG's failure to close by the extended deadline effectively ended further negotiations, and (2) Nabors was terminating the ERG SPA. The same day, Pinsky and Wirzba independently emailed Peterson, asking whether Nabors had closed the deal with its counterparty.

- On March 20, Pinsky again emailed Peterson, "Can we have a call on this matter. We think we have identified your other parties and the number. We are of the view we [are] more qualified to close and honor any future

22

covenants as well we ask to discuss the number directly with Nabors with a view to making an increased offer." Wirzba also emailed Nabors, again inquiring whether the ERG SPA closed.

- Also on March 20, ERG filed suit in Harris County against Nabors, Ramshorn, and Parex Canada requesting specific performance of the ERG SPA and injunctive relief and asserting tortious-interference claims against Parex Canada and Nabors. Pinsky averred in an affidavit that, on March 20, he received ERG's petition requesting specific performance and injunctive relief and a copy of the ERG SPA. Around the same time, a Harris County ancillary judge denied ERG's request for a temporary restraining order enjoining sale of the Class A shares and set ERG's request for a temporary injunction for a hearing on April 13.[16]

- On or around March 21, Nabors informed Pinsky that the ERG SPA had been terminated. Pinsky then re-submitted via email the $75 million proposal to Nabors.

- On March 23, ERG obtained an ex parte injunction from a Bermuda court, temporarily restricting Nabors from selling Class A shares. On April 5, the Bermuda court discharged the injunction after a full hearing with all parties.

- At the end of March, Parex Canada retained Bermudian attorneys, including Jonathan Betts, to aid in the acquisition of the Class A shares.

- On April 9, Parex Bermuda was incorporated in Bermuda for the purpose of purchasing the Class A shares. Pinsky and Betts were among Parex Bermuda's directors.

- At some point during the negotiation process, David Taylor (Parex Canada vice-president of exploration) and Smith made plans for Taylor to meet Smith in Houston regarding sale of the Class A shares. The meeting was to occur during Taylor's upcoming stop in Houston on his return to Canada from Trinidad. However, Taylor ultimately decided not to stop in Houston.

---

[16] ERG contends Parex Canada's contacts following ERG's filing suit on March 20, 2012 are relevant because Parex Canada knew about ERG's request for specific performance of the ERG SPA but nonetheless continued to entice Nabors to enter into an agreement with a Parex entity, effectively hampering ERG's opportunity to receive specific performance. We will consider Parex Canada's post-lawsuit contacts without deciding whether doing so is proper because, even considering them, we conclude Parex Canada did not purposefully avail itself of the benefit of conducting business in Texas.

- On April 12, Nabors and Parex Bermuda executed and closed the Parex SPA with a New York forum-selection clause. Parex Bermuda executed the Parex SPA in Bermuda. Moreover, Parex Canada signed a guarantee in favor of Nabors, guaranteeing payment owed by Parex Bermuda under the Parex SPA. A provision in the guarantee expressed it was executed to induce Nabors to enter into the Parex SPA. The guarantee also contained a New York forum-selection clause.

The evidence supports a finding that, after execution of the ERG SPA, Parex Canada continued contacting Nabors for two interrelated reasons: (1) to cause Nabors to not sell the Class A shares to ERG[17]; and (2) to cause Nabors to sell the Class A shares to Parex. ERG appears to contend we should limit our jurisdictional inquiry regarding its tortious-interference claim to facts relevant to the former reason. However, because Parex Canada's Texas contacts were clearly and undisputedly made for the ultimate purpose of acquiring the Class A shares, we cannot view Parex Canada's contacts solely as being aimed at harming ERG.

Parex Canada's main goal was acquiring the Class A shares of a Bermudian entity operating in Colombia, meaning Parex Canada did not seek to purchase a Texas asset.[18] Nor did Parex Canada seek to establish a continuing relationship with Texas. Instead, Parex Canada contacted the Texas seller for a one-time purchase of a non-Texas asset requiring no residual Texas relationship,[19]

---

[17] We do not make any comment on the actual merits of ERG's tortious-interference claim against Parex Canada—our analysis is strictly limited to the jurisdictional issue.

[18] *See Retamco*, 278 S.W.3d at 339 (holding defendant purposefully availed itself of privilege of conducting activities in Texas, despite not physically entering Texas, by accepting allegedly fraudulent assignment of Texas assets, thereby creating ongoing relationship with Texas); *Bryan*, 384 S.W.3d at 918–19 (noting fact that Texas-based plaintiff's asset was located in Oregon was factor attenuating Oregon-based defendant's Texas availment).

[19] *See Moncrief*, 414 S.W.3d at 153–54 (explaining defendants' contacts were purposeful and substantial because purpose of contacts was to establish long-term joint venture in Texas); *Moki Mac*, 221 S.W.3d at 578 (holding defendant purposefully availed itself of benefits of conducting business in Texas because its contacts were "aimed to get extensive business in or from [Texas]"); *Peters*, 396 S.W.3d at 70–71 (explaining defendant had substantial connection

particularly because Parex Canada's guarantee had a New York forum-selection clause.[20]  Moreover, Parex Canada made the contacts because it did not want Nabors to sell the Class A shares to ERG—a company with whom Nabors unilaterally entered into the ERG SPA and which happened to be based in Texas. These factors weigh in favor of Parex Canada's Texas contacts being attenuated and fortuitous.

We next consider the means of Parex Canada's contacts.  Parex Canada's CFO Pinsky averred that Parex Canada does not conduct business, market products, pay taxes, or have offices, bank accounts, property, employees, or a registered agent in Texas.  Pinsky denied that a Parex Canada employee ever traveled to Texas "for any meetings, negotiations, or due diligence relating to the execution of the [Parex SPA]."  No evidence was admitted contradicting this statement.  Pinsky also asserted that Parex Canada employees and an agent (i.e., Wirzba) "did have limited telephone and e-mail communications primarily with individuals who work for Nabors Corporate Services, Inc. in Houston, Texas leading up to the closing of the [Parex SPA], [and] all such telephone calls and e-mails occurred while Parex Canada employees were in Canada or Colombia."

"[C]hanges in technology have made reliance on phone calls obsolete as proof of purposeful availment." *Michiana Easy Livin' Country, Inc. v. Holten*, 168

---

with forum state because defendant and plaintiff anticipated a contractual relationship "of an indefinite amount of time," and defendant repeatedly found business opportunities for plaintiff in forum state); *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 282–83 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (explaining ongoing and continuous nature of defendant's Texas contacts).

[20] *See Citrin Holdings*, 305 S.W.3d at 282 ("A choice of law clause selecting the laws of a different forum weighs against finding a defendant subject to personal jurisdiction in Texas."); *see also Bryan*, 384 S.W.3d at 913 ("[A] defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there.").

S.W.3d 777, 791 (Tex. 2005). "While the ubiquity of 'caller ID' may allow nonresidents to know a caller's telephone number, that number no longer necessarily indicates anything about the caller's location." *Id.* Our court has applied this logic to email communications. *See Bryan*, 384 S.W.3d at 917 ("[W]e believe the purposeful-availment analysis should not turn on the fortuity of where the Texas resident was physically located when the defendant e-mailed the contract or when the defendants made allegedly actionable misrepresentations by e-mail."); *Riverside Exports, Inc. v. B.R. Crane & Equip., LLC*, 362 S.W.3d 649, 655 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("Like telephone calls, emails do not necessarily indicate anything to the recipient about the sender's location. The physical address where one may send or retrieve an email is no more fixed to a particular location than the address where one may send or receive a telephone call. We see no reasoned basis for distinguishing between the two means of communication, particularly when many of the same devices can be used for both.").

We acknowledge that *Michiana*, *Bryan*, and *Riverside Exports* all involved situations in which the plaintiff solicited telephone or email communications from the out-of-state defendant, whereas Parex Canada became the solicitor after being informed that Nabors had entered into the ERG SPA. *See Michiana*, 168 S.W.3d at 787, 794; *Bryan*, 384 S.W.3d at 915; *Riverside Exports*, 362 S.W.3d at 653–54, 655–56.[21] Further, although the supreme court recognized changes in technology

_____

[21] *See also Peredo v. M. Holland Co.*, 310 S.W.3d 468, 473 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("Significantly, none of [foreign defendant's] email exchanges with [Texas plaintiff] were initiated by [defendant]."); *Proskauer Rose LLP v. Pelican Trading, Inc.*, No. 14-08-00283-CV, 2009 WL 242993, at *3–5 (Tex. App.—Houston [14th Dist.] Feb. 3, 2009, no pet.) (mem. op.) (holding Texas court lacked specific jurisdiction over defendant New York law firm whose emailed communications to Texas plaintiff allegedly constituted professional negligence, in part because firm did not initiate the representation but was recommended to plaintiff by a third party); *Johns Hopkins Univ. v. Nath*, 238 S.W.3d 492, 499 (Tex. App.—

have rendered telephone calls to Texas insufficient as automatic evidence of purposeful availment, the supreme court "has not held that telephone calls are *never* sufficient to establish minimum contacts." *Glencoe Capital Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 165 (Tex. App.—Fort Worth 2008, no pet.). "Jurisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985).

The evidence supports a finding that Parex Canada made telephone calls and sent emails to Nabors-related individuals whom Parex Canada knew worked in Houston. In fact, in a March 6, 2012 email, Wirzba asked Nabors personnel if Pinsky could discuss high-level financial issues with them at "10am Houston or 10:30 Houston." Nevertheless, Parex Canada's knowledge that Nabors personnel worked in Houston and would receive some or all of Parex Canada's communications while physically in Houston is, without more, insufficient to establish purposeful availment of the benefits of conducting business with Texas when the goal of the communications has little to do with Texas law or benefits, i.e., acquiring the Class A shares.[22]

---

Houston [14th Dist.] 2007, pet. denied) ("All of the allegedly tortious activity occurred in Baltimore, Maryland, or in emails to a Canadian doctor, not in Texas."); *Weldon-Francke v. Fisher*, 237 S.W.3d 789, 797–98 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (emphasizing defendant's telephone calls to Texas, even if tortious, were made "while gratuitously responding" to plaintiffs' inquiries).

[22] *See Marsh v. Marsh*, 241 S.W.3d 570, 573, 576–77 (Tex. App.—El Paso 2007, no pet.) (holding Texas court lacked specific jurisdiction over foreign defendant who allegedly made single tortious telephone call to Texas plaintiff's wife for purpose of interfering with plaintiff's agreement); *see also KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 392–93 (Tex. App.—Dallas 2012, no pet.) (holding foreign defendant's contacts insufficient to demonstrate purposeful availment when defendant initiated contact with Texas plaintiff and allegedly made misrepresentation by telephone and email to plaintiff); *Buffet Partners, L.P. v. Sheffield Square, L.L.C.*, 256 S.W.3d 920, 924 (Tex. App.—Dallas 2008, no pet.) (rejecting specific jurisdiction because "[t]he sole connection to Texas was that it was the state in which

Purposeful availment is also not established by the trial court's implicit finding that Parex Canada knew Ramshorn's virtual data room was physically located in Texas. There is no evidence Parex Canada sought to take advantage of Texas law by accessing a virtual data room which Nabors unilaterally decided to locate in Texas. *See Info. Servs. Group, Inc. v. Rawlinson*, 302 S.W.3d 392, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (concluding defendant's access to plaintiff's Texas-based server did not establish purposeful availment, in part because plaintiffs unilaterally chose to locate server in Texas).

Additionally, Parex Canada's telephone, email, and virtual data room contacts with Nabors coupled with a finding that Parex Canada intended the contacts to harm ERG in Texas is not enough to establish purposeful availment.[23] ERG focuses heavily on caselaw premised on the "directed tort" (aka "effects") rationale of purposeful-availment jurisprudence, under which a foreign defendant purposefully avails itself of "the privilege of causing a consequence in" the forum state when the defendant's "communications with [that state give] rise to intentional tort causes of action." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999).

"However, in *Michiana*, the Texas Supreme Court expressly rejected personal jurisdiction based solely on the effects or consequences of an alleged tort committed in another forum that had repercussions in Texas." *Cerbone v. Farb*, 225 S.W.3d 764, 772 (Tex. App.—Houston [14th Dist.] 2007, no pet.).[24]

---

[plaintiff] received the communications").

[23] Specifically, ERG contends Parex Canada knew its contacts with Nabors would cause harm to ERG in Texas and interfere with the ERG SPA which contained a Texas forum-selection clause.

[24] *See also Lisitsa v. Flit*, No. 14-13-00126, --- S.W.3d ----, 2013 WL 6450428, at *5 (Tex. App.—Houston [14th Dist.] Dec. 10, 2013, no pet. h.) ("Texas's interest in protecting its citizens against torts is insufficient to automatically exercise personal jurisdiction upon an

28

The *Michiana* court disapproved of cases—including two from our court—in which courts held, "If a tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state, he must reasonably anticipate being haled into court there to answer for his actions." *Michiana*, 168 S.W.3d at 788–89 & n.63. This is because the "directed tort" rationale shifts a court's focus from the relationship among the *defendant*, the forum, and the litigation to the relationship among the *plaintiff*, the forum, and the litigation. *Id.* at 790. Minimum-contacts analysis focuses solely on the actions and reasonable expectations of the defendant. *Id.* The *Michiana* court recognized that United States Supreme Court cases concerning the "directed tort" rationale involved defendants who had *substantial* presences in the forum state. *Id.* at 789 (recognizing that in *Calder v. Jones*, 465 U.S. 783 (1984), defendant sold 600,000 magazines per week in forum state, and in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), defendant sold 10,000 magazines per month in forum state); *see also Paul Gillrie Institute, Inc. v. Universal Computer Consulting, Ltd.*, 183 S.W.3d 755, 761 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (analogizing its facts with those in *Calder* and *Keeton*). Our court has explained *Michiana*'s construction of *Calder*:

> The *Michiana* court did not construe the finding of specific jurisdiction in *Calder* as turning on the defendants' alleged wrongdoing intentionally directed at a forum resident; rather, the *Michiana* court construed *Calder's* finding of specific jurisdiction as turning on the defendants' "substantial 'presence'" in the forum state[.]

*Nath*, 238 S.W.3d at 498.

---

allegation that a nonresident directed a tort from outside the forum against a resident."); *Peredo*, 310 S.W.3d at 475 ("[T]he 'directed tort' rationale employed in *Wien* was rejected by the Texas Supreme Court in *Michiana*."); *Weldon-Francke*, 237 S.W.3d at 797 ("[A]ny alleged knowledge that the brunt of the alleged damages caused by the alleged torts would be felt by the Fishers in Texas is insufficient to support specific jurisdiction.").

Recently, the Supreme Court of Texas determined a defendant's alleged out-of-state tortious interference did not give rise to personal jurisdiction in Texas even though the defendants knew the plaintiff would feel the effects of the interference in Texas. *Moncrief*, 414 S.W.3d 142. The Texas-based plaintiff had contracted with a California entity regarding a joint venture. *Id.* at 148, 156. At a meeting in California, the foreign defendants allegedly urged the California entity to breach its agreement with the plaintiff. *Id.* at 156–57. The court held this action did not subject the defendants to personal jurisdiction in Texas, explaining,

> As we held in *Michiana*, a nonresident directing a tort at Texas from afar is insufficient to confer specific jurisdiction. The focus is properly on the extent of the defendant's activities in the forum, not the residence of the plaintiff. Thus, [the defendants'] alleged tortious conduct in California against a Texas resident is insufficient to confer specific jurisdiction over [the defendants].

*Id.* at 157 (citations omitted).

Our facts differ from those in *Moncrief* because Parex Canada's alleged tortious interference occurred, not at a meeting in another state, but via emails and telephone calls which Parex Canada—at least to a certain extent—unilaterally sent to Texas-based Nabors.[25] Nevertheless, the fact that ERG has established that Parex Canada had some contacts with Texas is not enough to establish purposeful availment—ERG must establish a "substantial presence." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 661 (Tex. 2010); *see also Rudzewicz*, 471 U.S. at 475–76 ("Jurisdiction is proper, however, where the contacts proximately result

---

[25] We say "at least to a certain extent" because, as explained above, although Parex Canada became the solicitor after learning about the execution of the ERG SPA, the fact that Parex Canada continued to contact a Texas-based seller, allegedly interfering with another Texas-based entity's contract, is still connected to Nabors's unilateral decisions to reach out to Parex and contract with Texas-based ERG.

from actions by the defendant *himself* that create a 'substantial connection' with the forum State.").

Parex Canada contacted Nabors solely by telephone and email regarding a one-time purchase of a non-Texas asset requiring no continuing relationship with Texas and signed a guarantee with a New York forum-selection clause.[26] The fact that Parex Canada was contacting Texas was fortuitous and attenuated and not for the purpose of obtaining some benefit, advantage, or profit of Texas. *Moki Mac*, 221 S.W.3d at 575. Under *Michiana*'s rejection of the "directed tort" rationale, Parex Canada's alleged intentional interference with the ERG SPA—the effects of which Texas-based ERG felt in Texas, particularly because of the Texas forum-selection clause in the ERG SPA—does not support a finding that Parex Canada had a significant relationship with Texas. *See Keeton*, 465 U.S. at 780 (explaining plaintiff's residence in the forum may enhance contacts, not because it is where plaintiff feels effects of injury, but because of defendant's relationship with forum-based plaintiff); *Kelly*, 301 S.W.3d at 661 ("[W]e rejected the concept of directed-

---

[26] Comparatively, cases in which a defendant's telephone and emails contacts were factors toward establishing minimum contacts involved substantially more evidence of purposeful availment than in the present case. *See Dodd v. Savino*, No. 14-12-00555-CV, --- S.W.3d ----, 2013 WL 5861517, at *5–6 (Tex. App.—Houston [14th Dist.] Oct. 31, 2013, no pet. h.) (concluding nonresident defendant had sufficient minimum contacts with Texas because defendant contacted plaintiff via telephone, email, and an actual trip to Texas and intended to establish a continuing business relationship with plaintiff); *Hale v. Richey*, No. 10-11-00187-CV, 2012 WL 89920, at *7 (Tex. App.—Waco Jan. 11, 2012, no pet.) (mem. op.) (concluding defendant's allegedly defamatory telephone calls and text messages to individuals in Texas were sufficient to support trial court's exercise of specific jurisdiction over defendant because the contacts pertained to administration of Texas-based trust of which defendant was a beneficiary); *Wilson v. Baker*, No. 03-10-00507-CV, 2011 WL 6938523, at *5 (Tex. App.—Austin Dec. 29, 2011, no pet.) (mem. op.) (holding defendant "purposefully availed himself of the privilege of conducting activities in Texas, albeit purely through telephone conversations and written and electronic correspondence," because he established continuing relationships and obligations with Texas lawyers by contacting the lawyers "in Texas, induc[ing] them to represent his friends in Texas courts by promising to pay them, and sen[ding] money to Texas addresses").

31

a-tort jurisdiction in *Michiana*, instead affirming the importance of the defendant's contacts with the forum state.").[27]

For the most part, "it is hard to imagine what possible benefits and protection [Parex Canada] enjoyed from Texas law." *Michiana*, 168 S.W.3d at 787; *see also KC Smash*, 384 S.W.3d at 394 ("[A]ppellant's 'availing' was for the purpose of building its restaurants in Kansas, not for reaping a profit or obtaining a benefit or advantage in Texas."). Because Parex Canada's ultimate goal was to obtain non-Texas assets from a seller who happened to be in Texas, "it is hard to imagine how [Parex Canada] would have conducted its activities any differently if Texas had no law at all." *Michiana*, 168 S.W.3d at 787. However, ERG contends Parex Canada's contacts with Nabors after ERG filed suit on March 20, 2012 are particularly important because the evidence supports a finding Parex Canada—along with Parex Bermuda and Nabors—worked to close a deal before the April 13, 2012 hearing in a Texas court regarding ERG's request for a temporary injunction. ERG asserts that Parex Canada, Parex Bermuda, and Nabors intentionally closed on April 12 to moot ERG's request for injunctive relief. We agree the evidence supports an inference that Parex Canada acted to prevent an injunction sought in a Texas court and, thus, in this instance, arguably sought a benefit of Texas law (i.e., defending against a request for injunctive relief). Nevertheless, this finding does not mean Parex Canada purposefully availed itself of Texas benefits for purposes of specific jurisdiction because it was ERG that

---

[27] Because of the supreme court's rejection of the "directed tort" rationale, ERG's reliance on cases in which courts focused on whether the foreign defendant tortiously interfered with a contract containing a Texas forum-selection clause is misplaced. *See Kwik–Kopy Corp. v. Byers*, 37 Fed. App'x 90, 2002 WL 1021889, at *5–6 (5th Cir. 2002) (not precedential in this context); *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam).

filed suit in Texas, thus unilaterally necessitating Parex Canada to engage in the Texas injunction proceedings.

ERG additionally relies on *Luxury Travel Source v. American Airlines, Inc.*, in which the Fort Worth Court of Appeals held the trial court had specific jurisdiction over the Canadian defendant, explaining "[the Canadian defendant] deliberately induced its Texas customers[, who originally initiated contact with defendant,] to undertake further activity in Texas, directed at a Texas [plaintiff], in direct contravention of an agreement between those [customers] and the Texas [plaintiff]." 276 S.W.3d 154, 164–65 (Tex. App.—Fort Worth 2008, no pet.). Although *Luxury Travel* bears some similarities with the present case, it is distinguishable because (1) part of the defendant's business was to engage in continuous and ongoing contacts with the plaintiff's website, Texas call centers, and Texas servers, (2) the defendant directed Texas customers to make misrepresentations to the plaintiff, and (3) it was foreseeable that a large number of individuals comprising the defendant's customer base would reside in Texas where the plaintiff was located. *Id.* at 163–65, 166.

ERG also cites *Mullins v. TestAmerica, Inc.*, in which the Fifth Circuit held Texas had specific jurisdiction over a Texas creditor's fraudulent-transfer claim against a foreign creditor. 564 F.3d 386, 400–02 (5th Cir. 2009). The foreign creditor allegedly caused a foreign debtor to transfer funds to the foreign creditor in contravention of the Texas creditor's agreement with the foreign debtor. *Id.* However, *Mullins* is distinguishable because that court relied heavily on the "directed tort" rationale rejected in *Michiana*, the foreign creditor—as majority shareholder of foreign debtor and an insider to the deals—had control over the fraudulent transfer, and the fraudulent transfer singled out the Texas creditor (all other creditors were paid). *Id.* ("Given [the foreign creditor's] level of

involvement with the challenged transfer, we find particularly persuasive the analysis of *Calder*'s 'effects' test as applied to tortious interference with contract claims."). ERG's other cases are likewise distinguishable.[28]

In sum, focusing on the quality of Parex Canada's Texas contacts, we conclude the evidence, viewed in the light most favorable to the trial court's ruling, does not support a finding that Parex Canada purposefully availed itself of the privilege of conducting activities within Texas. *See Retamco*, 278 S.W.3d at 339 ("[T]he minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number."). In fact, by never meeting in Texas, signing agreements with New York forum-selection provisions, and forming a Bermuda subsidiary to contract with Nabors, it appears Parex Canada intended to "purposefully avoid [Texas] by structuring its transactions in such a way as to neither profit from [Texas's] laws nor subject itself to jurisdiction there." *Moki Mac*, 221 S.W.3d at 575. Accordingly, the trial court may not properly exercise specific jurisdiction over Parex Canada.[29]

---

[28] *See, e.g.*, *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 382–84 (5th Cir. 2003) (relying on "directed tort" rationale and evidence Texas plaintiff and foreign defendant had long-term contractual relationship which created an abundance of business activity in Texas); *Miss. Interstate Exp., Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1011–12 (5th Cir. 1982) (holding Mississippi court could exercise jurisdiction over foreign defendant who tortiously interfered with Mississippi-centered contract which foreseeably resulted in nonpayment to Mississippi-based plaintiff, meaning damage felt in Mississippi); *Byers*, 2002 WL 1021889, at *6 ("[I]f intentional conduct is intended to cause injury in a specific state, that is sufficient to give specific jurisdiction to the courts of that state."); *Whalen v. Laredo Nat. Bancshares, Inc.*, 37 S.W.3d 89, 92 (Tex. App.–San Antonio 2000, pet. denied) (relying on "directed tort" rationale), *abrogated on other grounds by Marchand*, 83 S.W.3d 789.

[29] We arrive at the same conclusion even if Parex Canada is responsible under an alter-ego theory for Parex Bermuda's individual Texas contacts, described in Section V.

## B. Trial court lacks general jurisdiction over Parex Canada

We next consider whether the trial court has general jurisdiction over Parex Canada. This inquiry requires determining whether Parex Canada made continuous and systematic contacts with Texas. *See id.*; *Marchand*, 83 S.W.3d at 796.

As previously mentioned, Parex Canada does not conduct business, market products, pay taxes, or have offices, bank accounts, property, employees, or a registered agent, in Texas. Since its incorporation, Parex Canada has engaged in the following Texas contacts aside from the $75 million Parex SPA:

- In November 2010, Parex Canada made certain filings with the Texas State Securities Board relative to a Texas investor who purchased, without any solicitation from Parex Canada, a relatively small amount of shares of Parex Canada's common stock.

- During a layover in Houston in February 2011, Parex Canada vice-president Taylor had a meeting with other non-Texas entities regarding development of Colombian assets. Later, Parex Canada conducted due diligence in Texas regarding these assets, but a deal never materialized.

- In March and June 2011, Parex Canada personnel attended meetings in Houston regarding the purchase of the Colombian-based Remora assets. One of the Remora entities had a Houston office. This deal materialized, and Parex Colombia purchased the assets for $255 million. The transaction closed in Bermuda. Apparently, Texas-based Nabors entities and personnel were involved in this transaction.

- In October 2011, Parex Canada contracted to purchase software from a company that maintains a Houston office. The contract contains Texas-based forum-selection and arbitration clauses. However, Parex Canada deals exclusively with Canadian-based personnel of the company.

- In November 2011, Parex Canada purchased equipment from a non-Texas entity which unilaterally chose to ship the equipment to Houston, at which point Parex Canada paid for the equipment to be shipped to Trinidad by a Houston-based company. Parex Canada engaged in similar transactions between December 2011 and February 2012.

- In January 2012, Parex Canada held a managers retreat in Houston, which was a central location relative to the location of the Parex entities. Several officers attended, including Pinsky, Taylor, and Parex Canada CEO Wayne Foo. The meeting did not involve any discussion regarding solicitation of Texas business.

- Also in January 2012, Foo remained in Texas after the managers retreat to participate in several informational sessions regarding investor relations. Foo did so at the request of a separate Canadian-based entity which is a party to an underwriting agreement with Parex Canada. During the sessions, Foo provided publicly available information regarding Parex Canada for purposes of creating awareness of Parex Canada stock, not to actually sell stock. Parex Canada engages in over 150 such sessions per year around the world.

- Also while attending the January 2012 managers retreat, a Parex Canada employee met with a Houston-based subsidiary of a Canadian company to discuss operational matters regarding drilling in Trinidad. Parex Canada did not enter into any contracts as a result of this meeting.

- Finally, on multiple occasions, Parex Canada personnel have made phone calls from Houston during layovers.

These contacts are simply too sporadic to permit a Texas court to exercise general jurisdiction over Parex Canada. For a corporation, the paradigm forum for the exercise of general jurisdiction is the place in which the corporation is fairly regarded as at home. *Knight Corp. v. Knight*, 367 S.W.3d 715, 727 (Tex. App.— Houston [14th Dist.] 2012, no pet.). A corporation's continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity. *Id.*

Clearly, Parex Canada's trips, activities, and purchases in Texas have not rendered Texas as Parex Canada's home or even an intermediate place of business.[30] Additionally, many of the aforementioned contacts were fortuitous and

---

[30] *See PHC–Minden*, 235 S.W.3d at 170 ("[P]urchases and related trips, standing alone, are not a sufficient basis for a State's assertion of [general] jurisdiction." (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984))); *see also DENSO Corp. v.*

not purposeful, such as a third party choosing to send equipment through Houston, a Texas individual choosing to invest in Parex Canada, and a Canadian-based entity requesting a Parex Canada officer conduct informational sessions in Texas.[31] Even Parex Canada's involvement in significant expenditures—$255 million for the Remora assets and $75 million for the Ramshorn assets—are not enough to subject Parex Canada to general jurisdiction.[32] We hold Parex Canada does not have continuous and systematic contacts with Texas, and the trial court may not properly exercise general jurisdiction over Parex Canada.

Having determined that the trial court erred by denying Parex Canada's special appearance, we sustain Parex Canada's first issue.

## C. ERG's cross-issue that it was denied adequate discovery

In a cross-issue, ERG contends that, if we determine the trial court may not exercise personal jurisdiction over Parex Canada, we should nonetheless remand ERG's case against Parex Canada for further proceedings because the trial court erroneously denied ERG relevant jurisdictional discovery. *See Marchand*, 83 S.W.3d at 800 (considering plaintiff's complaint that, if supreme court reverses denial of defendant's special appearance, case should be remanded because trial court prevented plaintiff from conducting sufficient jurisdictional discovery).

---

*Hall*, 396 S.W.3d 681, 693–96 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (concluding foreign entity's 155 trips to Texas over a ten-year period, many of which were business related, coupled with entity's business contracts with Texas companies and other Texas-impacting activities, did not establish a general business presence in Texas).

[31] *See Moni Pulo Ltd. v. Trutec Oil and Gas, Inc.*, 130 S.W.3d 170, 180 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding defendant's contacts were too fortuitous and attenuated to subject defendant to general jurisdiction).

[32] *See Reyes v. Marine Drilling Cos., Inc.*, 944 S.W.2d 401, 403, 404 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (concluding foreign entity's $246 million worth of purchases from over 470 Texas companies did not subject entity to general jurisdiction in Texas); *see also Grupo TMM, S.A.B. v. Perez*, 327 S.W.3d 357, 363 n.1 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Specifically, ERG complains that the trial court denied ERG's motions to compel Parex Canada to produce (1) Parex Canada's internal communications reflecting what they actually knew about ERG's status as Nabors's counterparty and whether they intended to interfere with the ERG SPA, and (2) Parex Canada's contacts after ERG filed suit on March 20, 2012.

Texas Rule of Civil Procedure 120a governs discovery issues related to special appearances. Tex. R. Civ. P. 120a. In particular, Rule 120a(3) provides the procedure a party must use to postpone disposition of the special appearance in order to conduct additional discovery:

> Should it appear from the affidavits of a party opposing the [special appearance] motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

*Id.* We review for abuse of discretion the trial court's ruling regarding procedures of Rule 120a. *Lamar v. Poncon*, 305 S.W.3d 130, 139 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

ERG filed motions to compel jurisdictional discovery, which the trial court denied, but did not file a motion for continuance with attached affidavits as required under Rule 120a(3). ERG's motions to compel may be factors establishing ERG's due diligence in conducting discovery and, thus, supporting its right to a continuance.[33] However, because ERG did not follow the required procedure set out in Rule 120a(3) for continuing a special appearance, we cannot

---

[33] *See Marchand*, 83 S.W.3d at 800–01 (holding trial court did not abuse its discretion by denying plaintiff's motion for continuance because plaintiff did not file motion to compel when defendant objected to discovery); *Barron v. Vanier*, 190 S.W.3d 841, 847 (Tex. App.—Fort Worth 2006, no pet.) (explaining failure to move to compel discovery may show a lack of due diligence).

hold that the trial court abused its discretion by refusing additional jurisdictional discovery.[34]

Regardless, ERG complains about the lack of discovery related to Parex Canada's internal communications reflecting whether they intended to interfere with the ERG SPA, and contacts occurring after ERG filed suit. As noted above, the evidence supports a finding that Parex Canada knew Texas-based ERG was the counterparty and, by continuing to solicit Nabors, intended to interfere with the ERG SPA. Further, we considered several Parex Canada contacts following the filing of ERG's suit, including evidence that Parex Canada intended to moot ERG's request for a temporary injunction. Nevertheless, we determined that the trial court may not exercise specific jurisdiction over Parex Canada. Hence, the additional discovery requested by ERG likely would have been duplicative and unavailing. *See Moncrief*, 414 S.W.3d at 157–58 (determining, on appeal from a final judgment, trial court did not err by denying motion to compel because plaintiff failed to demonstrate discovery sought was not duplicative); *Solgas Energy Ltd. v. Global Steel Holdings Ltd.*, No. 04-06-00731-CV, 2007 WL 1892206, at *7 (Tex. App.—San Antonio July 3, 2007, no pet.) (mem. op.) ("Solgas has failed to allege sufficient information which, if existing and

---

[34] *See IRN Realty Corp. v. Hernandez*, 300 S.W.3d 900, 903 (Tex. App.—Eastland 2009, no pet.) (holding trial court abused its discretion by granting motion to compel and abating special appearance hearing to allow plaintiff to conduct additional discovery because plaintiff did not follow procedures for continuance under Rule 120a(3)); *see also Washington DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 739 (Tex. App.—Houston [14th Dist.] 2013, pet. filed) (holding plaintiff did not follow procedures under Rule 120a(3) for discovery continuance); *Said v. Maria Invs., Inc.*, No. 01–08–00962–CV, 2010 WL 457463, at *3 (Tex. App.—Houston [1st Dist.] Feb. 11, 2010, pet. denied) (mem. op.) ("Rule 120a(3) gives the trial court the discretion to continue a special appearance hearing and thereby extend the time in which evidence may be served, but this power applies only to a party opposing the special appearance who avers that he cannot adequately prepare for the special appearance hearing."); *Lamar*, 305 S.W.3d at 139 (determining plaintiffs complied with Rule 120a(3) because they "moved three times for jurisdictional discovery, attaching affidavits to their motions each time").

discovered, could support its alter ego allegations and thereby support general jurisdiction.").

That additional discovery would have been immaterial is exemplified by evidence ERG claims was recently produced. After this appeal was submitted, ERG filed a letter brief claiming newly discovered evidence—on which the trial court denied discovery prior to ruling on the special appearances—more strongly supports a finding that Parex Canada knew (1) Ramshorn's financial and corporate information was located in Houston, and (2) that, as of March 9, 2012, ERG was Nabors's counterparty and is a Texas-based entity. However, this evidence does not strengthen ERG's contention that Parex Canada purposefully interfered with a Texas contract between Texas entities. In determining that the trial court lacks specific jurisdiction over Parex Canada, we deferred to the trial court's implicit finding Parex Canada knew on March 9, 2012 that Texas-based Nabors and Texas-based ERG entered into an SPA. Moreover, Nabors's unilateral decision to keep Ramshorn's financial and corporate information in Houston is insignificant because nothing indicates Parex Canada traveled to Texas to review the information. We overrule ERG's cross-issue.

## D. Conclusion of Parex Canada's appeal

We sustain Parex Canada's first issue challenging the trial court's denial of Parex Canada's special appearance and render judgment dismissing for want of jurisdiction ERG's claims against Parex Canada.

### V. PAREX BERMUDA'S SPECIAL APPEARANCE

Next, we turn to ERG's appeal challenging the trial court's order granting Parex Bermuda's special appearance. To recap, Parex Bermuda is a Bermudian

Parex entity incorporated on April 9, 2012 for the purpose of consummating the Parex SPA, which was executed and closed on April 12, 2012.

In its first issue, ERG argues Parex Bermuda expressly or implicitly ratified and adopted all of Parex Canada's contacts relative to interfering with the ERG SPA and, thus, is subject to specific jurisdiction for the same reasons as Parex Canada. We have already determined that Parex Canada's contacts do not subject it to specific jurisdiction. Likewise, assuming Parex Bermuda ratified Parex Canada's contacts, Parex Bermuda is not subject to specific jurisdiction in Texas. We overrule ERG's first issue.

In its second issue, ERG contends Parex Bermuda's own contacts coupled with the ratified contacts of Parex Canada support a determination that Parex Bermuda is subject to specific jurisdiction in Texas. Parex Bermuda director and attorney, Jonathan Betts, attested that, relative to the Parex SPA, he "exchanged less than 75 emails and 20 telephone calls with Nabors personnel." Some or most of the contacts occurred from the time of Parex Bermuda's incorporation on April 9 to the execution of the Parex SPA on April 12. ERG asserts that Parex Bermuda independently accessed Ramshorn's virtual data room, housed on a Texas server. Additionally, Parex Bermuda knew about the April 13 hearing on ERG's request for a temporary injunction and acted to close on a deal that would moot any injunctive relief.

Even viewing Parex Bermuda's independent contacts in conjunction with Parex Canada's contacts, we conclude Parex Bermuda did not purposefully avail itself of the privilege of doing business in Texas. Parex Bermuda executed the Parex SPA in Bermuda, and the Parex SPA contains a New York forum-selection clause. Additionally, as discussed above in the specific jurisdiction section regarding Parex Canada's appeal, evidence that Parex Bermuda wanted to moot

41

ERG's request for a temporary injunction to prevent the transaction is not a sufficiently significant contact to give rise to specific jurisdiction—ERG unilaterally requested the injunctive relief from a Texas court.[35] Parex Bermuda's contacts were fortuitous and attenuated and not for the purpose of establishing an ongoing relationship with Texas or obtaining some benefit, advantage, or profit of Texas. *Moki Mac*, 221 S.W.3d at 575.

ERG next contends Texas courts have personal jurisdiction over Parex Bermuda because Parex Bermuda executed the Parex SPA with notice of ERG's claim for specific performance of the ERG SPA. According to ERG, this means that Parex Bermuda "stands in Nabors's shoes" relative to the ERG SPA. In support, ERG cites caselaw providing that a purchaser who buys real property knowing that the seller has entered into a contract with another purchaser stands in the shoes of the seller "when specific performance is sought and may be compelled to convey title to the first purchaser." *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 527 (Tex. App.—Amarillo 1998, pet. denied). Because the ERG SPA contains a Texas forum-selection clause, ERG claims Parex Bermuda should have readily anticipated being haled into court in Texas when it purchased the Class A shares, knowing of ERG's claim for specific performance. We reject this theory because it focuses on Parex Bermuda's knowledge of Texas law on the equitable remedy of specific performance, not on Parex Bermuda's contacts with Texas. We overrule ERG's second issue.

Finally, in its third issue, ERG contends that if we determine the trial court may not exercise personal jurisdiction over Parex Canada, we should nonetheless remand ERG's case against Parex Canada for further proceedings because the trial

---

[35] We recognize that, as of the April 12 hearing on ERG's request for a temporary injunction, ERG had not yet added Parex Bermuda as a defendant in this suit. However, this fact does not alter our disposition.

court erroneously denied ERG relevant jurisdictional discovery. We have already rejected this argument, which ERG made as a cross-point in Parex Canada's appeal. Thus, we overrule ERG's third issue. Having overruled all of ERG's issues, we affirm the trial court's order granting Parex Bermuda's special appearance.

## VI. RAMSHORN'S SPECIAL APPEARANCE

Finally, we consider Ramshorn's appeal. In its first issue, Ramshorn contends the trial court erred by denying Ramshorn's special appearance. As noted in the Background section, Ramshorn is a Bermudian corporation with Class A shares relating to Ramshorn's Colombian assets. Ramshorn contends it has no offices, employees, or agents, and does not conduct operations, in Texas. It is undisputed that Claudia Arango, who was general manager and a board member of Ramshorn, resided in and conducted business from Colombia. However, the parties sharply contest whether Jordan "Digger" Smith, a resident of Texas, was an agent of Ramshorn. ERG contends Smith was Ramshorn's president and committed fraudulent misrepresentation while in Houston. ERG bears the burden of proving agency for purposes of establishing personal jurisdiction over Ramshorn. *See IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007); *Capital Fin. & Commerce AG v. Sinopec Overseas Oil & Gas, Ltd.*, 260 S.W.3d 67, 83 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

There is no dispute that Smith was head of Nabors's exploration business unit and president of Ramshorn Investments, Inc. ("RII"). RII is part of the exploration business unit and a separate entity from Ramshorn. Smith admits his duties included overseeing and gathering information about Ramshorn's exploration operations. Smith testified that he had an office in Houston during the

relevant timeframe and was involved in advising Nabors regarding negotiations and bids for the Class A shares.

Ramshorn denies that Smith was an officer, employee, or agent of Ramshorn. Nevertheless, Arango—Ramshorn's general manager and board member—testified that Smith was her boss and she believed at the time of the negotiations that he was Ramshorn's president. In a draft agenda for ERG's visit to Ramshorn's Colombia offices, Arango referred to Smith as Ramshorn's president. Arango emailed this agenda to Smith, who forwarded it to Dunne without correcting any mistaken reference to Smith as president. During the Colombia visit, ERG was provided an organizational chart for Ramshorn which referred to Smith as Ramshorn's president. Thus, during negotiations with ERG, Smith was represented to be Ramshorn's president.[36] According to Arango, Ramshorn's human resources in Colombia had referred to Smith as Ramshorn's president in presentations to potential buyers since at least 2010, and Smith never told her to cease referring to him as president. She also testified that, aside from the lawyers representing Ramshorn in this lawsuit, no one has ever told her that Smith is not Ramshorn's president.

Additionally, Arango testified that, in her role as general manager of Ramshorn, she contacted Smith requesting financing for Ramshorn operations. Arango routinely sent Smith authorizations for expenditure ("AFEs") seeking approval for multi-million dollar projects, including during the period when ERG was negotiating with Ramshorn. Arango also agreed that Smith signed several

---

[36] Ramshorn also argues Arango likely mistakenly referred to Smith as president of "Ramshorn International Limited" because its name is very similar to "Ramshorn Investment, Inc.," the actual entity of which Smith is president. However, Arango's own testimony contradicts this explanation because she explained she believed Smith was president of both Ramshorn and RII.

approvals for AFEs as president of Ramshorn. According to Arango's testimony, Smith held the purse strings for Ramshorn's operations. In fact, attorneys representing Ramshorn in this litigation stated in a court filing that approving AFEs is the "ultimate demonstration of control in oil and gas operations."[37]

Despite the foregoing evidence, Ramshorn argues several pieces of evidence demonstrate Smith was not its president:

- Arango explained she thought Smith was Ramshorn's president because she considered him as her boss who controlled Nabors's financing of Ramshorn, not because she had actually seen corporate documents so designating him. She also stated in an affidavit that she has since learned Smith has never been president of Ramshorn.

- During his deposition, Smith vociferously denied ever being president or an agent of Ramshorn. There is evidence that Smith was sent AFEs merely because Nabors provided funding to Ramshorn, not because Smith was actually president of Ramshorn.

- The due-diligence confidentiality agreement was between ERG and RII, and Smith signed the agreement as president of RII.[38]

- When ERG requested salary information based on persons listed in the organizational chart (which referenced Smith as president), Arango's responding document did not include Smith. The ERG SPA contained a schedule of "information for each employee of [Ramshorn]," which did not include Smith. Also, a register of Ramshorn's directors and officers did not include Smith.

- In his affidavit, Dunne averred he was friends with Smith and had worked on several projects with him but did not state he believed Smith was Ramshorn's president or agent. Instead, Dunne stated he understood Smith

---

[37] Ramshorn correctly notes that ERG's exhibits pertaining to AFEs were never admitted into evidence. Nevertheless, all the evidence referenced in this paragraph came from Arango's deposition testimony, which is part of the record.

[38] However, in the confidentiality agreement, ERG agreed not to disclose due-diligence information regarding Nabors "and its affiliates," a phrase defined as "a person, company or entity controlling, controlled by, or under common control with a party." Clearly, Ramshorn was an affiliate of Nabors for purposes of the confidentiality agreement, a fact Smith recognized during his deposition.

was "head of Nabors Industries, Limited's ('NIL') oil and gas exploration and production ('E&P') businesses, and in that regard . . . understood [Smith] to direct a number of NIL's E&P subsidiaries." According to Ramshorn, because of Dunne's longstanding friendship with Smith, Dunne must have been aware Smith was not president of Ramshorn.

Although the foregoing evidence may conflict with a finding that Smith was actually Ramshorn's president, it was the trial court's function to weigh, accept, and disregard the evidence in arriving at its factual findings. *See City of Keller*, 168 S.W.3d at 819; *Ellis*, 971 S.W.2d at 407. The trial court could have reasonably found that Ramshorn would not have allowed Smith to be referred to as its president for several years, including signing his name as president on critical AFEs, if it were not true. The sale of Ramshorn's Class A shares involved tens of millions of dollars, and it is reasonable to believe Ramshorn would not unknowingly allow Smith to be represented as its head officer during such negotiations. Similarly, the court could have found Smith himself would not have signed multi-million dollar AFEs as Ramshorn's president unless it were true.[39] Accordingly, the evidence is legally and factually sufficient to support a finding that Smith actually was Ramshorn's president during Ramshorn's negotiations with ERG. *See United Residential Props. v. Theis*, 378 S.W.3d 552, 564 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Actual authority is created through written or spoken words or conduct of the principal communicated to the agent" denoting authority the principal "(1) intentionally confers upon an agent, (2)

---

[39] Because we hold evidence is sufficient to support a finding that Smith actually was Ramshorn's president, we need not consider Ramshorn's argument that Dunne never expressly testified that he personally believed Smith was the president. For purposes of our jurisdictional analysis, Ramshorn's argument is relevant to an apparent-authority inquiry, not an actual-authority inquiry. Whether ERG actually relied on these alleged misrepresentations or attributed them to Smith concerns the merits of ERG's fraud claim.

46

intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." (citations omitted)).[40]

ERG asserts that Ramshorn, through its agent Smith, made a misrepresentation in Texas to ERG. In his affidavit, Dunne averred as follows:

> On or about January 16, 2012, Mr. Wood and I met with Scott Peterson and Digger Smith in a conference room on the 10th floor at their Houston offices located at 515 West Greens Road, Houston, Texas to discuss the potential acquisition of Ramshorn's Colombian assets. At this meeting, several acquisition options were discussed, including the acquisition of Ramshorn's Class A shares or the direct acquisition of Ramshorn's Colombian assets. In addition, Mr. Peterson raised the possibility of having Ramshorn assign its Colombian assets to a company called Columbus Energy, Ltd. ("Columbus"), which Mr. Peterson informed me was a "clean shell" corporation that Nabors controlled. Mr. Peterson informed me that any transaction could close quickly because Ramshorn had "clean title" to its Colombian oil and gas interests.

Ramshorn argues that, even if Smith were Ramshorn's president, nothing establishes that Smith was acting in his role as Ramshorn's president during the Houston meeting or that he had authority to negotiate the sale of Class A shares—shares owned by Nabors, not Ramshorn.

However, the trial court could have reasonably found that Smith was acting in his role as Ramshorn's president (in addition to his role as president of RII and

---

[40] Ramshorn also argues ERG did not establish Smith was Ramshorn's agent because nothing proves Ramshorn had any control of Smith. In support of this contention, Ramshorn cites the general legal proposition, "The critical element of an agency relationship is the right to control, and the principal must have control of both the means and details of the process by which the agent is to accomplish his task in order for an agency relationship to exist." *Coleman v. Klockner & Co. AG*, 180 S.W.3d 577, 588 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Although there is no express evidence that Ramshorn had the right to control Smith's actions, the trial court could have reasonably inferred such a finding due to the fact Ramshorn was governed by a board of directors and frequently represented Smith as its president in important matters. In other words, the board of directors had control because it logically could have voted to remove Smith from his position as president.

head of the Nabors entities' exploration business unit) during the meeting because the nature of Ramshorn's oil and gas interests were discussed and Smith had already been represented to be Ramshorn's president during presentations for the sale of the Class A shares. Furthermore, ERG does not claim Smith entered into a contract on behalf of Ramshorn with ERG. Instead, ERG contends Smith is responsible for certain misrepresentations regarding Ramshorn's ownership, or ability to acquire ownership, of an interest in exploration and production blocks. As president of Ramshorn (in conjunction with being head of the Nabors entities' exploration business unit), Smith reasonably would have knowledge of what oil and gas interests Ramshorn owned and thus could make representations about such assets, particularly to a potential buyer during the due-diligence phase, notwithstanding the fact that Nabors, not Ramshorn, was responsible for sale of the Class A shares. *See Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) ("As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts."); *Huynh v. Nguyen*, 180 S.W.3d 608, 620 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The Texas contacts of agents or employees are attributable to their nonresident principals.").

Ramshorn contends that, even if the evidence supports a finding that Smith was Ramshorn's president and represented Ramshorn at the January 16 Houston meeting, Ramshorn cannot be held responsible for alleged misrepresentations made by Peterson, not Smith.[41] However, a defendant's liability for a fraudulent

---

[41] Contrary to Ramshorn's objection, Peterson's alleged misrepresentations during the Houston hearing were not hearsay because they are not offered to prove the truth of the matter asserted but as operative facts of ERG's misrepresentation claim. *See Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.*, 896 S.W.2d 807, 816 (Tex. App.—Texarkana 1995, writ denied). Additionally, because this evidence involves a direct contact with Texas related to ERG's fraud claim, it is relevant in a specific-jurisdiction analysis.

misrepresentation does not always require that the defendant affirmatively make the misrepresentation.

Silence is equivalent to a false representation when circumstances impose a duty to speak and one deliberately remains silent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986); *see also Corpus Christi Area Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 198 (Tex. App.—San Antonio 1991, no writ). For a party to be liable for fraud, it need not have made representations directly to the plaintiff. *In re Arthur Andersen LLP*, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). Each party to a fraudulent scheme is responsible for the acts of the other participants done in furtherance of the scheme and liable for fraud. *Id.* A party may be liable for the fraudulent misrepresentations of a third party by mere silent acquiescence when he benefitted from the fraud. *Id.* In fact, ERG argued during the evidentiary hearing, "[W]hat we have said is that [Smith] did not utter the mis-reps. He conveyed them via e-mail, presentations that were prepared by his subordinates, Ms. Arango. [Smith] was present when Mr. Peterson made these mis-reps in a meeting with Ramshorn. *So, at a minimum he assented to them by his presence and his failure to speak up*." (emphasis added).

Accordingly, the evidence supports a finding that Ramshorn, through its president Smith, made contacts during a meeting in Texas from which ERG's fraud claim arose. Ramshorn argues that it did not purposefully avail itself of Texas jurisdiction because Nabors controlled the sale of the Class A shares and required Ramshorn to be involved in the negotiations for the Class A shares, i.e., Ramshorn had no say whether or not to provide due-diligence information or make presentations to potential buyers. However, the evidence supports a finding that Smith was the person who originally solicited ERG and set up Dunne's trip to

Colombia, and no evidence establishes that Smith was not a willing participant in the Houston meeting on January 16. Under these facts, the trial court could have reasonably found Ramshorn purposely sought benefits of Texas's jurisdiction from which Ramshorn's alleged liability arises because Smith, as Ramshorn's president, willingly attended the Houston meeting during which alleged misrepresentations occurred for purpose of furthering the sale of the Class A shares. *See Moncrief*, 414 S.W.3d at 153–54 ("Because the Gazprom Defendants attended two Texas meetings, at which they accepted Moncrief's alleged trade secrets regarding a proposed joint venture in Texas, their contacts were not unilaterally from Moncrief, nor were they random and fortuitous."); *see also Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 849–550 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (holding defendant purposefully availed itself of Texas jurisdiction by allegedly making misrepresentations during meetings in Texas). From such findings, the trial court could also have inferred that it was foreseeable any disputes deriving from that meeting might be heard by a Texas court. *See Rudzewicz*, 471 U.S. at 474 (explaining foreseeability critical to due process analysis is that defendant's conduct and connection with forum state are such he should reasonably anticipate being haled into court there). We hold the evidence is legally and factually sufficient to support a finding that Ramshorn established minimum contacts with Texas.

Finally, Ramshorn argues Texas's exercise of jurisdiction over Ramshorn is unconstitutional because such exercise does not comport with traditional notions of fair play and substantial justice. *See Marchand*, 83 S.W.3d at 795. We determine whether the exercise of jurisdiction complies with traditional notions of fair play and substantial justice by considering the following factors, when appropriate: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the

50

dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies. *Moncrief*, 414 S.W.3d at 155. If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice. *Id.* In a special appearance, a defendant bears the burden of presenting a compelling case that the presence of some consideration would render jurisdiction unreasonable. *Horizon Shipbuilding*, 324 S.W.3d at 851.

Ramshorn argues Texas's exercise of jurisdiction would offend traditional notions of fair play and substantial justice because (1) Ramshorn's personnel will expend excessive time and expense traveling from Colombia to Texas to defend the litigation[42]; (2) there is no evidence ERG cannot obtain convenient and effective relief by suing in Colombia or Bermuda; (3) there is no evidence Texas has more of an interest in providing a forum for this dispute than does Colombia or Bermuda; (4) any agreement Ramshorn had with Columbus regarding the Jag-A Block will need to be interpreted in light of unique Colombian law and business practices, and the Colombian government, due to its ownership of all minerals, has an interest in the resolution of this case; and (5) having already attempted to receive injunctive relief in Bermuda, ERG has established that non-Texas forums are more appropriate.

We disagree Ramshorn has met its burden of presenting compelling reasons that render the trial court exercise of personal jurisdiction over Ramshorn unreasonable. Although it may be expensive and time-consuming for Ramshorn

---

[42] Ramshorn presented evidence that a round-trip ticket from Colombia to Houston is approximately $4,700, and the flight time is roughly five hours.

personnel to travel to Texas, it also would be burdensome and inconvenient to ERG if it were required to litigate in Colombia, and it is inarguably more convenient for ERG to litigate this case in its home state. Further, by seeking injunctive relief in Bermuda in conjunction with seeking injunctive relief in Texas, ERG did not concede other forums are more appropriate.

Moreover, even if Colombian law and business practices are relevant in this litigation and the Colombian government has some interest in the outcome, Ramshorn personnel came to Texas and allegedly made misrepresentations to a Texas company: "Texas has an obvious interest in providing a forum for resolving disputes involving its citizens, *particularly disputes in which the defendant allegedly committed a tort in whole or in part in Texas*." *Id.* (emphasis added); *see also Moni Pulo Ltd.*, 130 S.W.3d at 180 (holding exercising jurisdiction would offend traditional notions of fair play and substantial justice because, among other reasons, Nigerian government owned all minerals and was interested in outcome of dispute between a Nigerian defendant *and a Nigerian plaintiff* involving acts that occurred *outside Texas*). We are confident Texas courts will be able to apply and construe Colombian law as is necessary. Moreover, the crux of ERG's claims against Ramshorn is whether a foreign company committed fraud, not the Colombian government's interest in certain minerals. Thus, Texas and the United States foreign relations with Colombia is not a significant issue. *See Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 726 (Tex. App.—Austin 2000, pet. dism'd w.o.j.) ("The federal government's foreign policy interests are not hindered when individual states ensure that large international companies operate in an equitable business environment in which wrongs are redressed by those responsible.").

Accordingly, we hold the trial court did not err by concluding Texas has specific jurisdiction over Ramshorn relative to ERG's misrepresentation claim and overruling Ramshorn's special appearance. We overrule Ramshorn's first issue and affirm the trial court's order.

## VII. CONCLUSION

In sum, we (1) reverse the trial court's order denying Parex Canada's special appearance and render judgment dismissing for want of jurisdiction ERG's claims against Parex Canada, (2) affirm the trial court's order granting Parex Bermuda's special appearance and dismissing for want of jurisdiction ERG's claims against Parex Bermuda, and (3) affirm the trial court's order denying Ramshorn's special appearance and remand for further proceedings consistent with this opinion.

/s/    John Donovan
        Justice

Panel consists of Justices Brown, Christopher, and Donovan. (Brown, J., not participating.).[43]

---

[43] Justice Jeffery V. Brown was assigned to the panel for this case and participated during oral argument. However, he was subsequently appointed to the Supreme Court of Texas and did not participate in deciding this case. *See* Tex. R. App. P. 41.1(b) ("After argument, if for any reason a member of the panel cannot participate in deciding a case, the case may be decided by the two remaining justices.").